## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Civil Action No.: 1:24-cv-00285

TOSHIBA GLOBAL COMMERCE
SOLUTIONS, Inc.,

      Plaintiff,

      v.

TAWA, Inc.,
TAWA SERVICES, Inc.,
&
TAWA SUPERMARKETS, Inc.,

      Defendants.

**COMPLAINT**

Plaintiff Toshiba Global Commerce Solutions, Inc. ("TGCS"), through its undersigned counsel, respectfully submits this Complaint against Defendants Tawa, Inc. ("Tawa"), Tawa Services, Inc. ("Tawa Services"), and Tawa Supermarkets, Inc. ("Tawa Supermarkets"), and alleges:

## INTRODUCTION

1.    TGCS and Defendants (collectively, the "Parties") entered into a series of agreements in 2023, under which Defendants licensed the ELERA Commerce Software Solution ("ELERA") from TGCS for use in their retail grocery stores.

2.    First, Tawa executed a Master Customer Agreement ("Master

1

Agreement") with TGCS, effective June 8, 2023.

3. Second, Tawa executed a License Addendum Agreement ("License Addendum") with TGCS, effective June 28, 2023.

4. Third, Tawa Supermarkets executed a Statement of Work for Services ("Statement of Work") with TGCS, effective November 20, 2023.

5. These agreements also incorporated the International Program License ("IPLA") and any applicable License Information particular to a specific ELERA component (collectively, the "Agreements").

6. TGCS provided everything it was required to provide to Defendants under those Agreements, and more.

7. Defendants initially adhered to the terms of the Agreements.

8. But then Defendants stopped paying invoices from TGCS.

9. Nonetheless, TGCS continued its good-faith efforts to service its customer and continue the business relationship.

10. Less than a month ago, Tawa Services—which is not the primary entity that signed the Agreements—sent TGCS a notice that purports to terminate the Agreements in violation of the express terms of the Agreements (the "Notice").

11. Defendants have refused to communicate further with TGCS since sending that Notice, despite multiple attempts by TGCS to discuss the Notice.

2

12. This invalid Notice does not excuse Defendants from honoring their obligations under the Agreements.

13. Nor does the Notice allow Defendants to unjustly enrich themselves at TGCS' expense.

14. Defendants have anticipatorily repudiated the Agreements.

15. Defendants have also breached the Agreements by refusing to pay amounts invoiced under the Agreements and refusing to otherwise adhere to the Agreements' material terms.

16. Additionally, Defendants have been unjustly enriched by accepting the valuable products and services provided by TGCS without paying for them.

17. Defendants must honor the terms of the Agreements and pay their obligations to TGCS.

## **THE PARTIES**

18. Plaintiff Toshiba Global Commerce Solutions, Inc. ("TGCS") is a Delaware corporation with its principal place of business in Durham, North Carolina.

19. Defendant Tawa, Inc. ("Tawa") is, upon information and belief, a California corporation with its principal place of business in Santa Cruz, California.

20. Defendant Tawa Services, Inc. ("Tawa Services") is, upon

information and belief, a California corporation with its principal place of business in Buena Park, California.

21.     Defendant Tawa Supermarkets, Inc. ("Tawa Supermarkets") is, upon information and belief, a California corporation with its principal place of business in Buena Park, California.

22.     Upon information and belief, Defendants own and operate 99 Ranch Market, a large supermarket chain with 62 stores in 11 states.

## JURISDICTION AND VENUE

23.     This Court has personal jurisdiction over Defendants because Defendants reached into the forum to initiate business with TGCS, engaged in six months of extensive negotiations with TGCS, and deliberately engaged in long-term business activities in the forum state by contracting with TGCS. The claims in this suit arise out of those substantial and specific contacts. Furthermore, Section 1.13 of the Master Agreement specifically provides that any action pertaining to the Agreements "may be brought in the state or federal courts located in the state and county where either party maintains its principal place of business," and "[e]ach party consents to the jurisdiction of such courts to hear and decide such action." Pursuant to Rule 4 of the Federal Rules of Civil Procedure, personal jurisdiction over Defendants is conferred upon and vested in this Court by virtue of N.C. Gen. Stat. §§ 1-

Case 1:24-cv-00285-LPA     Document 1     Filed 03/29/24     Page 4 of 39

75.4(1)(d) and 1-75.4(5).

24.     This Court has original subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and there is complete diversity of citizenship between TGCS and all Defendants. The contracts at issue are valued at more than one million dollars. TGCS is a citizen of Delaware and North Carolina, whereas all Defendants are citizens of California.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391. Again, Section 1.13 of the Master Agreement provides that any action pertaining to the Agreements "may be brought in the state or federal courts located in the state and county where either party maintains its principal place of business."

## FACTUAL ALLEGATIONS

### Background on Parties' Agreements

26.     TGCS provides technology solutions (e.g., hardware, software, and services) to the largest retail chains across the United States and around the world. TGCS is the former IBM Retail Store Technology division, and was acquired by Toshiba Tec Corporation in 2012. TGCS' worldwide headquarters is located in Durham, North Carolina, USA. TGCS is one of the two largest providers of technology products to the retail industry. TGCS customers

5

include Walmart, Costco, Kroger, Harris-Teeter, Lowes Foods, Walgreens, Wegmans, and CVS.

27. Under the Agreements relevant to this dispute, TGCS grants Defendants a license to use TGCS' point-of-sale software platform, ELERA Commerce Software Solution ("ELERA").

28. Unless specifically requested by a customer in the License Addendum, or pursuant to a separately executed statement of work for professional services, the license grant to use ELERA is independent of any professional services or maintenance services.

29. TGCS offers its ELERA platform in a variety of ways: Customers may choose to implement the software themselves, engage a third-party consultant, or request additional paid professional services under which TGCS may provide consulting services to assist the customer in the implementation of the software.

30. If a customer requests professional services to assist in implementation, TGCS may provide assistance in testing, designing, installing, configuring, or deploying the software, or for other project management. Such assistance would be provided pursuant to a separate statement of work outlining the professional services and proposed cost and timeline.

Case 1:24-cv-00285-LPA    Document 1    Filed 03/29/24    Page 6 of 39

31. Whatever choice the customer makes, implementation, deployment, and operation of a retail point-of-sale software such as ELERA requires a multi-step testing, configuration, and enablement process before the software is ready to be used. Customers cannot use ELERA by simply downloading a new software program and immediately beginning use of such program.

32. TGCS also offers optional paid maintenance services to provide its customers the most current commercially available updates to the ELERA base software during the software maintenance period, and to provide technical assistance for a customer's routine installation, usage, and ELERA code-related questions.

33. Maintenance services do not include assistance for the design and development of configurations or customizations. Nor do they include professional services.

34. Here, Defendants contracted for paid maintenance services for a three-year, non-cancellable software maintenance term.

35. Defendants did not contract for *any* separate professional services when they purchased the license to ELERA and the three-year maintenance services.

36. Rather, Defendants chose the "self-enablement" approach, in

7

which a customer only procures a license to the software from TGCS, and then the customer performs all testing, implementation, deployment, and ongoing operation work itself.

37.     Under this approach, the customer does not receive any assistance from TGCS with its software testing, implementation, and deployment operations unless it enters into separate statements of work for professional services under which TGCS may assist in the testing, implementation, or deployment of the software, as specified by the customer.

38.     Defendants never requested that TGCS provide professional services to assist in the implementation or enablement of ELERA.

39.     That is, Defendants chose not to receive professional services from TGCS, even though these services could have included assistance to size their operating environment; identify any gaps which must be accounted for during implementation; define the operating environment in which the software will run; build out any necessary modules, test the software, and deploy and implement the software; or work out any problems with implementation.

## Negotiations

40.     This business relationship started when Defendants approached TGCS in early 2023 to inquire about using TGCS' software in Defendants' retail grocery stores.

41. Over roughly six months, TGCS and Defendants engaged in lengthy conversations and negotiations before contracting. In particular, TGCS personnel worked closely with an officer named Chihche Tsai.

> a. Mr. Tsai signed the Master Agreement and the License Addendum on behalf of Tawa, Inc. in his capacity as Chief Technology Officer.
>
> b. Upon information and belief, Mr. Tsai served as Chief Technology Officer of all Defendant entities.

42. During this pre-contract period, TGCS explained the functions of its ELERA software. In March 2023, TGCS performed a solution validation for Defendants. The information included a description of ELERA functions, operating environment requirements, interfaces, and other important information for Defendants to consider before they decided to license, implement, and deploy the ELERA software.

43. TGCS also explained the process for implementing the ELERA software across multiple retail locations.

44. TGCS informed Defendants of the various skillsets required to implement ELERA software.

45. TGCS suggested that Defendants engage TGCS or a third party for professional services to implement the ELERA software across multiple

retail locations.

46. However, Defendants maintained that their personnel had the skills and experience necessary for self-enablement.

47. After these discussions, Defendants decided to "self-enable" and implement the ELERA software themselves, rather than engage TGCS or a third party to provide professional services to assist Defendants with implementation of the ELERA software.

48. Defendants told TGCS that it denied professional services to save money.

49. In fact, Defendants were so concerned about saving money that they negotiated extensively with TGCS to obtain lower prices.

50. In exchange for lower pricing, Defendants agreed that their ELERA software license and software maintenance service commitments in the Agreements would be non-cancellable.

**The Agreements**

The Master Agreement

51. TGCS executed the Master Customer Agreement with Tawa, Inc. Mr. Tsai, then CTO, signed this agreement on behalf of Tawa on June 7, 2023.

52. The Master Agreement imposes obligations on Defendants. Among them:

10

a. Section 1.11.5(h) clearly provides that Defendants are "responsible for selecting the Products and Services that meet [their] needs and for the results obtained from the use of the Products and Services."

b. Section 5.1 further conditions performance on the provision of proper personnel, requiring that "[e]ach party … assign personnel that are qualified to perform the tasks required of such party."

c. Under Section 1.6.3, Defendants must pay invoices "upon receipt," "including any late payment fee."

53. As relevant here, Section 1.12 of the Master Agreement details limited termination rights.

a. For cause: Either party may terminate the Agreement "if the other does not comply with any of its terms," but the non-compliant party must be "given written notice and thirty days' time to comply." That is, termination for cause requires written notice and a minimum 30-day cure period before termination.

b. Without cause: Either party may terminate the Agreement "on written notice to the other following the expiration or

11

termination of the terminating party's obligations under this Agreement." That is, termination without cause is only possible if the terminating party has performed all its obligations under the agreement (including payment obligations) and with written notice.

54. Section 5.6 of the Master Agreement specifically covers termination of "Services."

    a. Under Section 5.6, in any termination of Services, Defendants agree to pay for "all charges for Services [TGCS] provides and any Products and Materials [TGCS] delivers through Service termination," as well as all "reimbursable expenses [TGCS] incurs through Service termination."

    b. If Defendants terminate without cause, they "agree[] to pay any applicable adjustment or termination charges."

    c. Either TGCS or Defendants may terminate for cause "if the other materially fails to meet its obligations concerning the Service."

55. Section 2.1 of the Master Agreement states that warranties for software programs are governed by "the warranty terms included in the applicable license agreement."

12

a. Section 2.2 clarifies that warranties do not apply if Defendants "misuse" the software or operate it in an "unsuitable physical or operating environment."

56. Page 13 of the Master Agreement includes a merger and integration clause providing that the Agreement "is the complete agreement" and "replaces any prior oral or written communications between" Defendants and TGCS. Additionally, it provides that "neither party is relying on any representation that is not specified in this Agreement."

<u>The IPLA</u>

57. The Parties are also bound by the International Program License Agreement ("IPLA"), which governs a customer's license to ELERA (and other TGCS software). As licensees of the ELERA software, Defendants accepted the terms of the IPLA by signing the License Addendum.

58. Section 1 of the IPLA sets forth a series of Definitions, all incorporated here by reference. Although this section defines the "Warranty Period" as "one year, starting on the date the original Licensee is granted the license," in this case the Warranty Period was modified by signed agreement of the Parties in the License Addendum, as detailed below.

59. The IPLA does not provide its own no-cause termination clause, except that Section 6 of the IPLA offers a money-back guarantee within *30*

13

*days* of the date the ELERA license is issued to Defendants. If Defendants were "dissatisfied with the [ELERA] Program for any reason" within this 30-day window, they could have terminated the ELERA license and obtained a refund of amounts paid for the software.

60.     Otherwise, Defendants must resort to warranty claims under Section 8 of the IPLA. Section 8.1 offers a limited warranty that "when used in its specified operating environment, [ELERA] will conform to its specifications." "If the [ELERA] Program does not function as warranted during the Warranty Period and the problem cannot be resolved," Defendants may return the ELERA software to TGCS and receive a refund of amounts paid, upon which return the ELERA license will terminate.

61.     Still, under Section 8.1, TGCS does "not warrant uninterrupted or error-free operation of the [ELERA] Program," and Defendants remain "responsible for the results obtained from the use of" ELERA. Section 8.2 further states that this warranty is Defendants' exclusive remedy, replacing all other warranties and conditions.

62.     Section 9 of the IPLA clarifies that TGCS might choose to assist Defendants "in isolating the cause of a problem with the [ELERA] Program," but that that level of support "is beyond [TGCS'] warranty obligations."

63.     Section 12 of the IPLA specifically contemplates that TGCS

14

software programs such as ELERA might include third-party components and software. Any fully integrated third-party code in TGCS software is warranted along with the rest of the software.

64. Like the merger clause in the Master Agreement, Section 2 of the IPLA notes that it "is the complete agreement" and "replaces any prior oral or written communications between" Defendants and TGCS regarding use of the ELERA software.

65. Section 13(j) further states that "neither party is relying on any representation not specified in this Agreement."

66. And providing further clarity, Section 13(j) specifically provides that neither party is relying on representations about "the performance or function of the [ELERA] Program, other than as expressly warranted in Section 8."

<u>The License Addendum</u>

67. TGCS executed a License Addendum Agreement with Tawa, Inc. Mr. Tsai signed this agreement in his capacity as Tawa's CTO on June 27, 2023.

68. The License Addendum includes details of the ELERA software licensed by Defendants, and the quantity of licenses. The License Addendum does not, however, include detailed lists of specific features.

69.     The License Addendum specifies that the term is a "Perpetual License, with three (3) years, non-cancellable maintenance."

70.     This term means that Defendants pay a *one-time fee* for the license to use the ELERA software for the specified number of ELERA software user licenses.[1]

71.     This term also obligates Defendants to three years of non-cancellable TGCS maintenance services for the ELERA software.

72.     The pricing accounts for the accelerated obligation.

73.     The License Addendum states that the total license cost is "payable net 30 days from invoice dates as defined."  Section 1 breaks down this total cost into four payments, the first of which was due "30 days from June 30, 2023," and the last of which is due "30 days from October 1, 2024."

74.     Such an arrangement is common in the industry, where the prices factor in both the nature of the license and the need to pay the fee upfront, as opposed to a recurring fee (like a subscription-service model).

75.     Section 2 of the License Addendum specifies the total cost for the ELERA software maintenance services.  This section also breaks down the total cost into a series of payments.  The first pro-rated payment was due

---

[1] Defendants purchased specific ELERA components under the License Addendum.  Later, in early November 2023, Defendants also separately purchased a single license for ELERA's Loyalty and Promotions component.

16

September 1, 2023, and pro-rated payments continue through 2024 and 2025. Beginning on January 1, 2026, Defendants are billed in advance.

76. Section 3 of the License Addendum confirms that Defendants agreed to a three-year, non-cancellable term for the software maintenance services. It also modifies the one-year warranty term set forth in the IPLA for particular ELERA components to the following:

      a. 30-day warranty term for "ELERA Microservices & Self-Enablement Tools & Platform."

      b. 180-day warranty term for "ELERA POS, Pay, Self Service, Mobile, and Loyalty & Promotions."

**Communications between the Parties after Executing the Master Agreement and the License Addendum**

77. Again, the Parties entered into the Master Agreement on June 8, 2023, and entered into the License Addendum on June 28, 2023. Both agreements were signed on behalf of Tawa, Inc. by Mr. Tsai, in his capacity as CTO.

78. On June 30, 2023, Defendants downloaded the ELERA software to their testing lab environment stored and hosted on their on-premise ("on-prem") servers to begin initial testing before its implementation and deployment to Defendants' Microsoft Azure cloud lab and production

17

environments for further testing and operations.[2]  TGCS provided Defendants

with version 1.2, the most current version available at that time.

79.     Defendants also gained access to a number of resources to assist

with ELERA testing, implementation, deployment, and operations, including

training videos, access to relevant code, information about the program's Azure

container registry, and more.

80.     In July 2023, TGCS made version 1.3 of ELERA available to

Defendants for download.

81.     Through the course of conversations between the Parties, in July

TGCS realized that Defendants lacked the skills and personnel necessary to

properly test, implement, or deploy the ELERA software, despite previous

representations to the contrary.  Nonetheless, Defendants continued to refuse

to engage or pay for TGCS or third-party support or assistance.

82.     By this time, TGCS had entirely fulfilled its obligations to deliver

ELERA.

83.     Because Defendants declined a separate statement of work for

---

[2] ELERA, like many other programs, can be deployed on-prem or from a
cloud environment.  On-prem deployment means that the software is hosted
and deployed from an environment on a customer's on-premises server.  Cloud
deployment means that the software is hosted and deployed from an
environment in a remotely located cloud server (like Microsoft Azure or Google
Cloud Platform).

professional services, TGCS had no further duties to Defendants aside from providing support for valid warranty requests during the warranty period and providing the contracted software maintenance services.

84.    TGCS also provided Defendants with suggestions of other third parties that could perform full-service implementation services if Defendants desired assistance.

85.    TGCS continued to note deficiencies in Defendants' project management abilities and technical expertise to help isolate issues with Defendants' implementation and deployment of ELERA in its on-prem lab environment.

86.    Put simply, it became apparent that Defendants were ill-equipped to implement ELERA through self-enablement, and required additional assistance despite their refusal to procure or pay for professional services to assist with implementation.

87.    Occasionally, TGCS would offer to help Defendants get their implementation on a better path, at no cost.  However, Defendants did not seem to understand or agree that they lacked skills and experience, and needed significant assistance from TGCS or another third party.

88.    For example, TGCS had to instruct Defendants to create an issues list several months into the project so that implementation tasks could be

19

tracked and resolved systematically. This commonplace organizational measure is a basic foundational step in any competent information-technology department.

89. Similarly, TGCS struggled to get Defendants to define a standard hardware configuration used in retail stores, with which the ELERA software would interact when operating. This was a foundational step for project planning and all stages of implementation in order to plan for, configure, and test all types of hardware configurations Defendants use in retail stores.

90. By late 2023, most of Defendants' personnel working on the ELERA implementation had changed.

<u>**The Parties Enter into a Statement of Work**</u>

91. Despite prior assertions by Defendants, it became apparent by late 2023 that Defendants lacked the necessary skills needed to deploy ELERA into Defendants' Microsoft Azure cloud environments.

92. Defendants did not have an enterprise subscription to a Microsoft Azure cloud environment at all, let alone personnel with the required expertise to implement and deploy ELERA into the Microsoft Azure cloud lab and cloud production environments.

93. After five months of struggling, Defendants decided to engage TGCS on a limited consulting basis.

94.     On November 20, 2023, the Parties entered into the Statement of Work.   That agreement was signed by Mr. Tsai on behalf of Tawa Supermarkets, Inc.

95.     Under the Statement of Work, TGCS agrees to "provide services at [Defendants'] request" related to Defendants' installation and deployment of ELERA into Defendants' Microsoft Azure cloud production and cloud lab environments.  These services were to be provided "on an as-needed and as-available basis," at an hourly rate.  TGCS agreed to provide up to 300 hours of services at this rate.  TGCS would invoice Defendants monthly for "hours worked and expenses incurred during the previous month."

96.     The Statement of Work still specifies that Defendants are "responsible for project management and for results achieved," and that Defendants are in charge of "[d]irecting task assignments" to TGCS.  Under the Statement of Work, TGCS agrees that its personnel will assist Defendants with a variety of tasks related to installation and deployment within Defendants' cloud production and cloud lab environments, upon request.

97.     The Statement of Work and TGCS' professional services provided to Defendants thereunder were necessary because, as was well known to Defendants, Defendants wanted and needed ELERA to be deployed into the Microsoft Azure cloud production environment in order to properly operate and

21

function across multiple retail stores and point-of-sale terminals.

## Communications between the Parties after the Statement of Work

98. In November 2023, TGCS provided Defendants with a further update to ELERA, version 1.4.

99. Defendants continued to struggle with their implementation of ELERA.

100. For example, Defendants claimed that the ELERA version 1.4 upgrade crashed their servers.

101. TGCS personnel determined that Defendants experienced these issues because of their own errors, such as having insufficient RAM to run version 1.4. When TGCS pointed out this problem, it was easily resolved. Like many other "issues," this was due to Defendants' unfamiliarity with the ELERA software and their unfamiliarity with their own systems.

102. Defendants' IT personnel also lacked the expertise necessary to diagnose or resolve these relatively basic problems.

103. Also around this time, Defendants stopped making payments to TGCS.

104. In fact, since November 28, 2023, Defendants have not made *any* payments to TGCS.

105. Upon information and belief, Defendants' Chief Technology Officer

Mr. Tsai resigned or was terminated in late 2023.

106. Despite the many problems of Defendants' own making, in January 2024, TGCS personnel successfully stood up a Microsoft Azure cloud environment for Defendants' use. TGCS personnel also explained the process to Defendants' personnel.

107. By late February 2024, Defendants realized that they needed more help for implementation than they could obtain through an hourly "assistance" Statement of Work.

108. Defendants requested proposals for a "project" Statement of Work, under which TGCS would promise to provide certain deliverables for the project rather than just as-needed assistance.

109. TGCS was in the process of preparing an estimate for completion of these requested additional services.

110. But upon information and belief, Mr. Tsai's successor in interest was less interested in continuing the relationship with TGCS and successfully deploying ELERA.

**Defendants' Purported Termination of the Agreements**

111. Without prior notice, on March 6, 2024, TGCS received a letter (the "Notice") purporting to terminate the Agreements. The letter was signed by Paul Yan in his capacity as the new Chief Technology Officer of Tawa Services,

23

Inc., an entity that was not a signatory to any of the Agreements.

112. By this time, Defendants had amassed hundreds of thousands of dollars' worth of unpaid, past due invoices from TGCS.

113. Prior to the Notice, TGCS had received no written notice that Defendants considered TGCS to be noncompliant with the terms of the Agreements.

114. Also, Defendants did not give TGCS 30 days to cure any alleged noncompliance, as required by Section 1.12 of the Master Agreement.

115. The Notice suggested, without support, that there were "significant discrepancies between the promised and delivered capabilities of" ELERA.

116. The Notice also contained a number of false allegations regarding TGCS' performance.

117. Many of the allegations concern supposed "promises" made by TGCS that are found nowhere in the Agreements, a fatal flaw in light of the Agreements' merger clauses (Master Agreement: Section 1.2 and p. 13; IPLA: Section 2) and no-reliance clauses (Master Agreement: p. 13; IPLA: Section 13(j)).

118. The Notice is an attempt by Defendants to change their mind about their purchase well after the return window has closed.

24

119.   As noted above, TGCS offered a generous 30-day money-back guarantee under Section 6 of the IPLA, pursuant to which Defendants could have returned the product and received a complete refund.

120.   Under the License Addendum and Section 8 of the IPLA, TGCS also offered 30-day and 180-day warranties on various components of the ELERA software.

121.   But Defendants are well past the time to change their minds about ELERA without providing cause.

122.   Turning to the specific allegations of the Notice, Mr. Yan stated that ELERA was portrayed by TGCS as an "out-of-box solution," but that it was in fact "not ready for deployment upon delivery."

   a. But as discussed above, TGCS made clear throughout the pre-contract negotiations and post-contract communications that ELERA requires substantial attention to configure and implement.

   b. Defendants ignored TGCS' suggestions to procure professional services from TGCS or a third party to help with implementation.

   c. TGCS never represented that ELERA could simply be installed and immediately put to use.

123. The Notice also complained of delays receiving system updates.

    a. But as detailed above, TGCS delivered the updated version 1.3 of ELERA to Defendants in July 2023, just one month after the initial delivery of the software.

    b. Just a few months after that, in November 2023, TGCS delivered the next update to version 1.4. There were no unreasonable and unexpected delays here.

124. The Notice further complained that the updates TGCS delivered caused problems for Defendants by crashing their servers.

    a. But the server crashes were caused by Defendants' failure to comply with requirements, such as having insufficient RAM to accommodate the version 1.4 update.

    b. Defendants' personnel also lacked the skill and expertise to resolve these relatively basic issues, which TGCS personnel were able to diagnose and resolve quickly.

125. The Notice stated that ELERA lacked important features that TGCS had "promised" to provide.

    a. But the Agreements do not include any representation by TGCS that ELERA will provide specific features claimed to be missing by Defendants in their Notice.

b. Nor did Defendants provide TGCS with a specific list of required features or functionalities during the contracting period.

c. Simply put, Defendants did not inform TGCS during the contracting period that they wanted or needed these features, and TGCS never represented or agreed that these features would be available in ELERA. Yet now Defendants complain that the features are not included in ELERA.

126. The Notice also criticized TGCS' use of a third-party reporting tool called Sisense, alleging that the use of such a third-party tool was "not disclosed" and "deviat[ed] from the agreed specifications."

a. But nowhere in the Agreements does TGCS promise not to use third-party products as part of ELERA.

b. To the contrary, as noted above, Section 12 of the IPLA specifically contemplates the integration of third-party code and software into ELERA.

127. In short, all of Defendants' "issues" in the Notice were caused by Defendants' failure to properly implement the ELERA software, or by Defendants' misunderstanding of the requirements and capabilities of the software throughout the testing, implementation, deployment, and operations

27

phases.

128.  As explained above, Defendants specifically chose to implement the ELERA software themselves, without assistance from TGCS or third-party experts, to avoid the expense of such assistance.

129.  Defendants could have asked for their unstated specifications to be made part of the Licensing Addendum.

130.  Defendants could have asked for a specific statement of work for professional services performed by TGCS to assist with implementation, or with development and delivery of desired features.

131.  Or Defendants could have taken advantage of a number of other professional services arrangements.

132.  But Defendants did none of these things.

133.  Put simply, Defendants had no desire to pay for professional services, but they wanted to realize the benefits of those professional services.

### TGCS Responds to the Notice

134.  On March 15, 2024, TGCS responded to the Notice by emailing Mr. Yan.  In the email, TGCS asked to schedule a phone call to discuss Defendants' concerns and attempt to find a mutually agreeable path forward.  TGCS received no response.

135.  Ten days later, on March 25, 2024, TGCS again emailed Mr. Yan

asking to schedule a conversation about the allegations contained in the Notice. Again, TGCS received no response.

136. Three days after that, on March 28, 2024, TGCS sent Mr. Yan a letter (copied by email) notifying him that Defendants' purported termination was ineffective and that Defendants were in breach due to nonpayment. Again, the letter attempted to schedule a conversation about the allegations contained in the Notice. Again, TGCS received no response.

137. Neither Mr. Yan, nor anyone else on Defendants' behalf, has responded to TGCS' communications since sending the Notice.

138. Despite TGCS' good-faith efforts, there has been no communication from Defendants to TGCS since the March 6, 2024 Notice.

139. Accordingly, Defendants repudiated the Agreements.

**<u>Defendants' Unpaid Invoices</u>**

140. At the beginning of the Parties' relationship, Defendants paid their invoices from TGCS, albeit not always on time.

141. On June 30, 2023, TGCS issued Invoice 67723 to Defendants. Defendants paid that invoice on July 27, 2023.

142. On September 12, 2023, TGCS issued Invoice 69023 to Defendants. More than 30 days after receipt and therefore late, Defendants paid that invoice on November 28, 2023.

143. Since November 2023, Defendants have not remitted any payments to TGCS.

144. On November 7, 2023, TGCS issued Invoice 1405513 to Defendants. As of the date of this filing, that invoice is still unpaid.

145. On December 2, 2023, TGCS issued Invoice 70743 to Defendants. As of the date of this filing, that invoice is still unpaid.

146. On January 1, 2024, TGCS issued Invoice 71203 to Defendants. As of the date of this filing, that invoice is still unpaid.

147. On January 30, 2024, TGCS issued Invoice 1409020 to Defendants. As of the date of this filing, that invoice is still unpaid.

148. On February 28, 2024, TGCS issued Invoice 1410319 to Defendants. As of the date of this filing, that invoice is still unpaid.

149. On March 11, 2024, TGCS issued Invoice 1410851 to Defendants. As of the date of this filing, that invoice is still unpaid.

150. On March 25, 2024, TGCS issued Invoice 1411396 to Defendants. As of the date of this filing, that invoice is still unpaid.

151. All conditions precedent to TGCS' right to pursue the allegations and claims have been fulfilled, and this action has been filed within all applicable periods of limitation and repose.[3]

_____

[3] In Section 1.13 of the Master Agreement, the Parties choice-of-law

30

## CLAIMS

## Claim I (Anticipatory Repudiation)

152.    All allegations referenced above are incorporated herein.

153.    As more particularly alleged above, TGCS and Defendants were and remain Parties to the Agreements.

154.    On March 6, 2024, Defendants repudiated the Agreements, expressing by Notice that it was "unsustainable to continue" under the Agreements and that Defendants "must exercise [their] right to terminate … effective immediately."

155.    Defendants' Notice amounted to a positive, distinct, unequivocal, and absolute refusal to perform under the Agreements.

156.    Defendants' actions constitute an anticipatory repudiation of Defendants' obligations under the Agreements.

157.    At the time of Defendants' repudiation, TGCS was ready, willing, and able to continue performing its obligations, and would have done so but for the repudiation by Defendants.

158.    Defendants' repudiation prevented TGCS from performing under the Agreements, and from receiving from Defendants compensation due to TGCS.

---

provision selects the law of the State of North Carolina.

159. Defendants' repudiation has caused and will continue to cause damage to TGCS through at least the remainder of the initial term of the Agreements.

160. TGCS' actual damages from Defendants' repudiation of the Agreements total over $1 million. In addition to these actual damages, TGCS is entitled to pre- and post-judgment interest and to all other damages, costs, and amounts recoverable by it under the Agreements or other applicable law (including special damages, incidental damages, exemplary damages, indirect damages, economic consequential damages, lost profits, lost revenue, lost goodwill, and lost anticipated savings), in respect of Defendants' repudiation of the Agreements.

## Claim II (Breach of Contract)

161. All allegations referenced above are incorporated herein.

162. Defendants materially breached the Agreements by failing to pay invoices when due and by terminating the Agreements without providing TGCS an opportunity to cure.

163. Defendants' failure to pay valid invoices from November 2023 to the present lacks basis, justification, or legitimacy under the terms of the Agreements.

164. Defendants' failure to pay valid invoices when due constitutes a

32

comprehensive material breach of Defendants' obligations under the Agreements.

165. Defendants' failure to provide TGCS with "thirty days' time to comply" with the Agreements after sending the Notice, or even to identify the terms with which TGCS was allegedly noncompliant, is contrary to the express terms of the Agreements.

166. Defendants' failure to allow TGCS the opportunity to cure constitutes a comprehensive material breach of Defendants' obligations under the Agreements.

167. At the time of Defendants' breach, TGCS was ready, willing, and able to perform its obligations, and would have done so but for the breach by Defendants.

168. Defendants' breach prevents TGCS from performing under the Agreements, and from receiving from Defendants compensation due to TGCS.

169. Defendants' breach has caused and will continue to cause damage to TGCS through at least the remainder of the initial term of the Agreements.

170. TGCS' actual damages from Defendants' breach of the Agreements total over $1 million. In addition to these actual damages, TGCS is entitled to pre- and post-judgment interest and to all other damages, costs, and amounts recoverable by it under the Agreements or other applicable law (including

33

special damages, incidental damages, exemplary damages, indirect damages, economic consequential damages, lost profits, lost revenue, lost goodwill, and lost anticipated savings), in respect of Defendants' breach of the Agreements.

## Claim III (Quantum Meruit)

171. All allegations referenced above are incorporated herein.

172. TGCS is entitled to claim against Defendants in quantum meruit for material breach of the Agreements and services provided.

173. Recovery in quantum meruit is available where no valid, enforceable contract governs the same subject matter as the quantum meruit claim.

174. TGCS is entitled to recovery for products and services provided after Defendants materially breached the Agreements.

175. TGCS is also entitled to recovery if the products and services provided by TGCS are determined to be outside the subject matter of an otherwise valid and enforceable agreement.

176. TGCS in good faith provided Defendants with ELERA software licenses, maintenance services, and professional services beneficial to Defendants.

177. These services were of value to, and indeed were actively sought by, Defendants.

34

178.   Defendants accepted these products and services provided to them to or for their benefit by TGCS.

179.   TGCS reasonably expected compensation for the products and services provided by it to or for the benefit of Defendants.

180.   Defendants received these products and services with the knowledge that TGCS expected compensation.

181.   TGCS is entitled to the reasonable value of all such products and services.  If Defendants are found to have materially breached the Agreements, such reasonable value may be determined based on the amounts invoiced or subject to invoice by TGCS.   If the Agreements are found to be valid and enforceable, but not to embrace those products and services provided to Defendants, then TGCS is entitled to the reasonable value of all such products and services for which it has not already been compensated by Defendants.

## Claim IV (Unjust Enrichment)

182.   All allegations referenced above are incorporated herein.

183.   TGCS is entitled to claim against Defendants for unjust enrichment.

184.   Recovery for unjust enrichment is available where one party provides a good or performs a service, and the other is unjustly enriched by accepting the good or service without providing reasonable compensation to

the performing party.

185.   TGCS in good faith provided Defendants with ELERA software licenses, maintenance services, and professional services beneficial to Defendants.

186.   TGCS did not provide these products and services to Defendants gratuitously.  Instead, TGCS reasonably expected to receive in exchange the payments due under the Agreements, as well as a continued fruitful business relationship with Defendants.

187.   Defendants accepted these products and services provided to them or for their benefit by TGCS.

188.   Defendants did not pay TGCS for these products and services.

189.   Defendants were thus unjustly enriched by accepting the valuable products and services provided by TGCS without providing reasonable compensation in exchange.

190.   TGCS is entitled to the reasonable value of all such products and services.  If Defendants are found to have materially breached the Agreements, such reasonable value may be determined based on the amounts invoiced or subject to invoice by TGCS.  If the Agreements are found to be valid and enforceable, but not to embrace those products and services provided to Defendants, then TGCS is entitled to the reasonable value of all such products

and services for which it has not already been compensated by Defendants.

## Claim V (Good Faith and Fair Dealing)

191.   All allegations referenced above are incorporated herein.

192.   TGCS is entitled to claim against Defendants for Defendants' breach of the implied covenant of good faith and fair dealing.

193.   Defendants' failure to pay invoices due from November 2023 to the present, their unjustified anticipatory repudiation of the Agreements, and their refusal to communicate with TGCS regarding the allegations made in their letter of March 6, 2024, or to otherwise provide TGCS with an opportunity to cure, constitute arbitrary and unreasonable behavior performed in bad faith.

194.   Defendants' arbitrary and unreasonable behavior injured the rights of TGCS to receive the benefits of the Agreements, in violation of the covenant of good faith and fair dealing.

## Claim VI (Declaratory Judgment)

195.   All allegations referenced above are incorporated herein.

196.   TGCS is entitled to a declaratory judgment declaring the rights and other legal relations of the Parties, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201.

197.   Specifically, TGCS is entitled to a judgment declaring that:

a.  Defendants have unlawfully repudiated the Agreements.

b. Defendants have materially breached the Agreements.

c. Defendants are required to make all payments to TGCS due under the Agreements, including both those already invoiced but not yet paid and those scheduled to be invoiced after the date of purported termination.

## **Jury Demand**

198.   Pursuant to Rule 38 of the Federal Rules of Civil Procedure, TGCS demands a trial by jury on all issues so triable.

TGCS reserves the right to modify and supplement its claims, including its request for relief, as more facts become available and to submit all documents, exhibits, witness statements, and other evidence as necessary to prove its claims and damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, TGCS respectfully prays for the following relief against Defendants:

A.    An award of damages and other relief in respect of its numbered claims;

B.    An order of declaratory judgment consistent with its claim for such relief;

C.    An award of the costs and expenses, including reasonable

38

attorneys' fees, incurred by TGCS in connection with this action; and

D.     Such other and further relief as the Court deems just and proper.

Dated: March 29, 2024                    Respectfully submitted,

                                         s/ H. Hunter Bruton
                                         H. Hunter Bruton
                                         N.C. Bar No. 50601
                                         hbruton@robinsonbradshaw.com

                                         Edward F. Hennessey, IV
                                         N.C. Bar No. 15899
                                         thennessey@robinsonbradshaw.com

                                         Clara Nieman
                                         N.C. Bar No. 61032
                                         cnieman@robinsonbradshaw.com

                                         **ROBINSON, BRADSHAW & HINSON, P.A**.
                                         1450 Raleigh Road, Suite 100
                                         Chapel Hill, North Carolina 27517
                                         Telephone:  (919) 328-8800

                                         *Counsel for Plaintiff*